UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                         :

SOTER TECHNOLOGIES, LLC,                  :

                               Plaintiff,        :

                                   :                  20-cv-5007 (LJL)

             -v-                        :

                                   :              OPINION AND ORDER

IP VIDEO CORPORATION, A+ TECHNOLOGY  :
& SECURITY SOLUTIONS, INC., and ADVANCE  :
CONVERGENCE GROUP, INC.,               :

                                 :

                          Defendants.     :

                                 :
-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/26/2021__

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Soter Technologies, LLC ("Plaintiff" or "Soter") brings this action against IP

Video Corporation ("IP Video Corp."), A+ Technology & Security Solutions, Inc ("A+

Technology"), and Advance Convergence Group ("Advance") (collectively, "Defendants"), for

cybersquatting in violation of 15 U.S.C. § 1125(d)(1); trademark infringement in violation of 15

U.S.C. § 1114(a); unfair competition, false association, and false designation of origin in

violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); and trademark infringement, unfair

competition, and product disparagement, under New York law. *See* Dkt. No. 35 ("Am. Compl."

or "Amended Complaint").

      Defendants move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss all claims in the

Amended Complaint against A+ Technology and Advance and to dismiss all claims except that

for cybersquatting against IP Video Corp.  For the reasons that follow, the motion is granted in

part and denied in part.

## BACKGROUND

Soter is a limited liability company organized under the laws of New York, with its principal place of business in New York.  Soter manufactures and markets a vape detecting sensor device ("Flysense Device"), which it sells to school systems and other institutions for their use in detecting vape smoke and other activity that might violate the institution's rules.  *Id.* ¶ 1.  The device can be installed in an unobtrusive manner in school bathrooms and other locations where it can be used to identify the prohibited activity.  Soter uses the FLYSENSE trademark ("Flysense Mark") in connection with the sale of the Flysense Device, suggesting a fly on the wall that can sense the vape smoke.  Soter is the owner of all rights in and to the Flysense Mark, which is filed with the U.S. Patent and Trademark Office in connection with the following goods: "Environmental sensor for detecting vape, vapor, smoke, sound, motion, gas and total volatile organic compounds (TVOCs)."  *Id.* ¶ 25.  Registration for the Flysense Mark was filed with the USPTO on October 9, 2019 and issued on May 19, 2020.  *Id.* ¶¶ 25, 26.  The registration claims a date of first use at least as early as November 2017.  *Id*. ¶ 26.

Defendants are three companies who allegedly make, sell, offer for sale and distribute a sensor device called HALO Smart Sensor ("HALO Device"), which can be installed in high school bathrooms.  The HALO Device is alleged to compete with the Flysense Device.  *Id*. ¶ 8.  Little is alleged about the Defendants' identity or relationship with each other except that they are affiliates, each has a principal place of business in New York, and they advertise the HALO Device.  All three Defendants are alleged to advertise the HALO Device on their respective websites, and Defendant IP Video Corp. is alleged to advertise the HALO Device at trade shows around the country.  *Id*. ¶¶ 9-11.  The three companies share office locations, resources and executives, including David Antar who is the President of IP Technology and A+ Technology

and Chief Executive Officer of Advance Convergence Group.  *Id*. ¶ 12.  The three companies are alleged to be engaged in interstate and foreign commerce.  *Id*. ¶ 13.

Soter also owns the domain name www.flysense.net, which it uses to advertise its Flysense Device. *Id*. ¶ 33.  Defendants knew of Soter's use of the Flysense Mark.  After seeing the Flysense Device on network television on Good Morning America in 2017, Defendant A+ Technology tried to become a reseller of the device.  *Id*. ¶ 39.  Plaintiff alleges that while Defendants had constructive knowledge of Plaintiff's superior rights in and to the Flysense Mark, Defendants allegedly began using the Flysense Mark as part of a bad-faith scheme to confuse and deceive customers.  *Id.* ¶ 38.  Specifically, for a period from approximately September 9, 2019 to July 1, 2020 (i.e., into the period when the Flysense Mark was issued to Plaintiff), Defendants used the domain name www.flysense.com to divert for their own commercial gain an unknown number of purchasers and business opportunities away from Plaintiff.  Customers who entered www.flysense.com into a browser were directed to Defendant IP Video Corp.'s website.  *Id*. ¶ 35.  On the website, IP Video Corp. displayed the HALO Device, and not the Flysense Device.  Neither the Flysense Mark, nor anything that resembled it, appeared in the content of the website itself.  Rather, in large bold letters, IP Video Corp.'s website refers to the HALO Smart Sensor.  *Id*. ¶¶ 35-36.

Plaintiff alleges that "Defendants are individually or collectively the current registrant of record for the [www.flysense.com domain name]," *id*. ¶ 56, and "[a]t the time Defendants registered, acquired and/or began using the [domain name], Plaintiff had obtained prior and exclusive rights in the Flysense Mark," *id*. ¶ 57.

Plaintiff brings claims for federal and state trademark infringement, unfair competition, and cybersquatting.[1]  It alleges that by using the www.flysense.com domain name to direct customers to Defendants' website where the HALO Device was depicted, Defendants were "likely to create a false impression and deceive customers, the public and the trade into believing that there was a connection, association, affiliation, or sponsorship between Plaintiff's FlySense and Defendants' HALO Device—which there was not." *Id*. ¶ 40.  It also alleges that "Defendants' cybersquatting caused Soter to lose purchasers and business opportunities" and that Defendants have made substantial profits and gains and Soter has suffered losses (of more than $2 million in lost sales) as a result of Defendants' unauthorized use of the FlySense mark as part of its domain name and other illicit acts. *Id*. ¶¶ 41-43.  It claims that Defendants have sold their product to schools to which Soter would otherwise have sold their product, that Plaintiff has been forced to reduce the price of its device to compete with the HALO Device, and that it has suffered loss of sales of secondary educational products purchased alongside the Flysense Device. *Id*. ¶¶ 44-46.

Soter also alleges it has been the victim of unfair competition and product disparagement in connection with other verbal and written representations by Defendants. *Id*. ¶ 47.  In support of that claim, it alleges that in 2019 a representative of Defendants told a potential customer of Plaintiff, a school on the west coast, that Plaintiff's device did not work, was associated with too many false positives, and was embroiled in litigation—all of which Plaintiff claims was disparaging and caused Plaintiff to lose at least one sale. *Id*. ¶¶ 48, 50.  Plaintiff also alleges that IP Video Corp. made other false statements directly leading Soter to lose sales for which both Plaintiff and IP Video Corp. were competing. *Id*. ¶ 51.  The sole example to which Plaintiff

---

[1] Defendants are not seeking to dismiss Plaintiff's cybersquatting claim by this motion.

points is an alleged false representation that it claims IP Video Corp. made to the Mission

Consolidated Independent School District in Mission, Texas[2] ("Mission District") that

Defendants' completing HALO Device was compatible with the Flysense platform, causing

Soter to lose a sale of over $43,000.  *Id*. ¶¶ 51-52.  The Amended Complaint makes no reference

to any particular agent of IP Video Corp. as having made the statement.

The alleged misrepresentation appeared in a response to a request for quote issued by the

Mission District.  Dkt. No. 59-6.  That document is incorporated by reference and integral to the

Amended Complaint.  There is no dispute as to its authenticity.  The quote form clearly indicates

the name of the firm making the offer as ACP Creativ IT ("ACP") and the brand and model of

the product being offered as "IPVIdeo Corp. HALO IOT Smart Sensor – Part # HALO-V2.00."

*Id*. at 6.  It attaches fifteen (15) pages of materials referring to the HALO Smart Sensor.  *Id*. at 7-

22.  It does not refer to Plaintiff or the Flysense Device.  It also does not indicate that any of the

Defendants made the offer or prepared the response to the request for quote.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by a complaint and a motion for a Temporary Restraining

Order and Preliminary Injunction filed on June 30, 2020.  Dkt. No. 1 at 9-13.  After hearing the

parties, on July 2, 2021, the Court entered a Temporary Restraining Order enjoining Defendants

for a period of fourteen (14) days from (1) resuming operation of the www.flysense.com domain

name (which they had ceased using upon receiving notice of this action), and (2) from stating

that the HALO Device is compatible with the Flysense proprietary software platform.  Dkt. No.

28.  The parties subsequently consented to converting the first restraint into a Preliminary

---

[2] Although the Amended Complaint alleges that the Mission Consolidated Independent School District is in New Mexico, Am. Compl. ¶ 52, it also attaches the request for quote that makes clear that the school district actually is located in Mission, Texas.  Am. Compl., Ex. C.

Injunction, which the Court so ordered on July 17, 2020.  Dkt. No. 51.  The Court scheduled a hearing on Plaintiff's motion to convert the second restraint into a Preliminary Injunction, but after exchanging initial discovery, Plaintiff withdrew its motion for a Preliminary Injunction as to that restraint.  Dkt. No. 61.  Defendant filed the instant motion to dismiss on July 31, 2021, Dkt. No. 57, the opposition was filed on August 17, 2020, Dkt. No. 64, and the reply was filed on August 31, 2020, Dkt. No. 70.  The Court heard oral argument on February 4, 2021.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

**DISCUSSION**

**A.      Claims regarding www.flysense.com domain name**

Plaintiff's Second, Third, Fourth and Fifth Causes of Action allege trademark infringement and unfair competition under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A), and New York common law, based on Defendants' alleged registration and use of the domain name www.flysense.com.

Section 32(1) of the Lanham Act prohibits the "use in commerce . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 43(a) prohibits the "use[ ] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(a).

The standards governing claims for unfair competition, under Section 43(a) of the Lanham Act, and for trademark infringement, under Section 32, are substantially the same. *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[T]he standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32 (15 U.S.C. § 1114)."); *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014) ("[A] federal claim of false designation of origin . . . is also referred to as a claim for unfair competition."). Both claims are governed by a "familiar two-prong test." *Coty Inc. v. Excell*

*Brands, LLC*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2015)).  "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) (quoting *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003)); *see Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (internal quotation marks and alterations omitted).  In addition, a sustainable claim must establish that the defendant made "use in commerce" of Plaintiff's trademark to begin with.  *See* 15 U.S.C. § 1114(1)(a) (restricting the "use in commerce" of "a registered mark"); 15 U.S.C. § 1125(a)(1)(a) (creating liability for "[a]ny person who . . . uses in commerce . . ." a registered or unregistered mark in a manner likely to cause confusion).  Moreover, "'use' must be decided as a threshold matter because, while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark."  *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005).

Under New York common law, the standards for trademark infringement and unfair competition are "virtually identical" to the standard under the Lanham Act, "except that [New York law] requires an additional showing of bad faith."  *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020) (quoting *TechnoMarine SA v. Jacob Time, Inc.*, 2012 WL 2497276, at *5 (S.D.N.Y. June 22, 2012)).

It is not disputed here that Plaintiff's registered mark is entitled to protection. Rather, Defendants argue that (1) Defendants did not make any "use in commerce" of Plaintiff's mark by causing the domain name www.flysense.com to reroute web browsers to defendant IP Video Corps.' website, because the Flysense Mark nor anything resembling it actually appeared in the content of that website, and (2) there was no likelihood of confusion by any customer over the origin or affiliation of the HALO Device advertised on the IP Video Corp. website. Neither argument is persuasive.

### 1. Use in commerce

The Lanham Act defines "use in commerce," in relevant part, as follows:

For purposes of this Chapter, a mark shall be deemed to be in use in commerce-

(1) on goods when-

   (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

   (B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . .

15 U.S.C. § 1127.[3]

---

[3] In an appendix to *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2d Cir. 2009), Judge Leval provides a thorough and perspicuous discussion of the text and history of § 1127 that calls into question whether its definition of "use in commerce" is applicable to sections of the Lanham Act that proscribe trademark infringement. Notwithstanding the questions raised by this appendix, the Second Circuit in its opinion "assumed . . . in accordance with the holding of [*1-800 Contacts, Inc.*, 414 F.3d at 400 (discussed *infra*)] that the requirements of [§ 1127's definition of 'use in commerce'] apply to infringing conduct," and found that such assumption did not affect the outcome of the case. *Id*. at 140. Similarly, the instant claims for trademark infringement and unfair competition in connection with IP Video Corp.'s use of the domain name at issue should be sustained irrespective of the applicability of the definition of "use in commerce" from § 1127. Accordingly, the Court makes the same assumption of applicability as is made in *Rescuecom*, although it should be noted that the applicability of § 1127's definition of "use in commerce" to

Both the plain text of this definition and the relevant caselaw support the conclusion that IP Video Corp.'s use of the domain name www.flysense.com to redirect customer traffic to its website constitutes a "use in commerce" of the Flysense Mark.  Defendants do not dispute that in the physical world a retailer who used a competitor's trade name or trademark as the name and/or identifier for a store would have used that name "in commerce" even if the customer— upon entering the store—did not see any products bearing the prohibited trademark.  Dkt. No. 90 (Hr'g Tr. Feb. 4, 2021), at 6-7.

The law is no different in the virtual world.  A domain name is not categorically only an address that a consumer can use to navigate to a store whose name it already knows; it can also serve as a sign used by a retailer to identify the contents of a store to those who might browse the web (much like one browses a shopping center) and has a choice to make whether to enter.  *Cf. Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999) ("Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store.").  "For consumers to buy things or gather information on the Internet, they need an easy way to find particular companies or brand names.  The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com."  *Sporty's Farm LLC v. Sportsman's Mkt. Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).  Although the means by which the customer both searches for the location to purchase the desired goods and enters the store may differ—by foot in the physical world and by entering text

---

sections of the Lanham Act proscribing infringement appears not to be definitively settled in this Circuit.  *See also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1024 & n.11 (9th Cir. 2004) (addressing trademark infringement claims under the Lanham Act and noting that while § 1127 "defines 'use in commerce,' . . . [that] definition applies to the required use a plaintiff must make in order to have rights in a mark, as defined by 15 U.S.C. § 1051 . . . [and] does not enter into our jurisdictional analysis").

in the address bar of a web browser or a search engine in the virtual world and then using a

finger to click—the company's use of in commerce of a trademark is the same whether it is

selecting text to go into a domain name or onto a store sign.  The intent of the retailer and the

effect of its action is to advertise to the would-be consumer that the store (physical or virtual)

that she is contemplating entering will have the desired products emanating from the desired

origin and thereby to induce her to shop in that store and buy the products found therein.  *See* 5

McCarthy on Trademarks and Unfair Competition § 25A:13 (5th ed. 2020 Update) ("Prospective

buyers usually assume that a company will have its business name or brand as its domain

name."); *SNA, Inc. v. Array*, 51 F. Supp. 2d 542, 552 (E.D. Pa. 1999), *aff'd sub nom. Silva v.

Karlsen*, 259 F.3d 717 (3d Cir. 2001) ("Someone looking for official information about the

Seawind [plaintiff's product] will likely go to [seawind.net], either by guessing it and typing it in

directly or by using a search engine and choosing this site from those listed because it sounds the

most official.") (collecting cases); *id*. at 552 n.9 ("Because of the quantity of information of the

Web . . . businesses would prefer that customers simply be able to find a Web site directly using

a corporate name, trademark or service mark."); *Brookfield Commc'ns*, 174 F.3d at 1045 ("Web

users often assume, as a rule of thumb, that the domain name of a particular company will be the

company name followed by '.com.'").

Thus, district courts in this Circuit and elsewhere have sustained trademark infringement

and Lanham Act unfair competition claims where a defendant has used a competitor's name as

its own domain name, including where the domain name itself is not registered as a trademark.

In *OBH, Inc. v. Spotlight Magazine, Inc*., a court in this Circuit held that use of the plaintiffs'

trademark "The Buffalo News" in the domain name "www.thebuffalonews.com," a website

operated by the defendants, satisfied § 1127's "use in commerce" definition (albeit for services,

not goods) because the website was used for commercial purposes and "affect[ed] plaintiffs'
ability to offer their services in commerce." *OBH, Inc. v. Spotlight Magazine*, Inc., 86 F. Supp.
2d 176, 185-86 (W.D.N.Y. 2000).  Similarly, in *N.Y. Soc'y of Cert. Pub. Accountants v. Eric
Louis Associates, Inc.*, on a motion for attorney's fees after entry of an injunction on consent, a
court in this District held that defendant's use of the domain name "nysscpa.com" (and its use of
the meta-tag "NYSSCPA") was likely to cause confusion with the plaintiff's mark NYSSCPA,
and stated that there was "little doubt that Defendant's use of Plaintiff's mark was for
commercial purposes" under the Lanham Act.  79 F. Supp. 2d 331, 356 n.5 (S.D.N.Y. 1999).
District courts outside of this Circuit have reached the same conclusion.  *See SNA, Inc.*, 51 F.
Supp. at 542 (Defendants "use[d]" plaintiff's mark "Seawind in their business in various ways"
including "maintain[ing] a website with the domain name seawind.net"); *Cardservice Int'l, Inc.
v. McGee*, 950 F. Supp. 737, 741-42 (E.D.Va. 1997), *aff'd*, 129 F.3d 1258 (4th Cir. 1997) (where
companies both provided credit and debit card services, use of defendant's "cardservice.com"
domain name "exactly duplicates" and infringes plaintiff's registered "Cardservice" trademark).

The conclusion also follows from the Second Circuit's discussion of the doctrine of
"initial interest confusion."  The initial interest confusion doctrine, discussed further *infra*,
addresses trademark infringement that "creates initial consumer interest, even if no actual sale is
completed as a result of the confusion."  *Bihari v. Gross*, 119 F. Supp. 2d 309, 319 (S.D.N.Y.
2000).  It thus addresses the question of likelihood of confusion that arises only after, and if, the
court has reached the conclusion that a mark has been used in commerce.  In *Savin Corp.*, the
Second Circuit recognized that a claim could be asserted under the initial interest confusion
doctrine based on the use of a competitor's mark as domain name upon a showing of intent.  It
observed:

> Internet initial interest confusion . . . arises when a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website addresses. . . . Because consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owners of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of intentional deception.

*Savin Corp.*, 391 F.3d at 462 n.13 (citing *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 207 (S.D.N.Y. 2000); *Bihari*, 119 F. Supp. 2d at 319)).

The unstated but necessary premise of that conclusion is that the misappropriation by one party of another party's mark to use as a domain name can satisfy the threshold "use in commerce" element of a claim for trademark violation. Were it otherwise, there would have been no need for the court to articulate the requirement of intentional deception and no violation even in the presence of intentional deception.

Defendants argue that the Second Circuit's decision in *1-800 Contacts*, 414 F.3d at 400, forecloses any claim for trademark infringement that is based on a defendant's use of a domain name. The Court disagrees that *1-800 Contacts* supports that broad proposition.

*1-800 Contacts* addressed claims against a defendant, WhenU.com, Inc. ("WhenU"), that used a proprietary software to generate pop-up advertisement windows based on a web-browser's online activities. *Id*. at 404. In order to generate advertisements with relevant content, WhenU maintained an online directory comprising "32,000 website addresses and address fragments, 29,000 search terms and 1,200 keyword algorithms." *Id*. (citation omitted). The plaintiff, 1-800 Contacts, Inc. ("1-800") owned and operated a website domain that was included in WhenU's directory. *Id*. at 404, 408. When an individual accessed 1-800's website by entering its domain name into the address bar or clicking a link to the website that appeared on a search engine, ads would "pop-up" in a separate window on the user's screen that corresponded to the product or services category associated by WhenU with the 1-800 website.

The pop-up windows could be closed without closing the window displaying 1-800's website. The plaintiff alleged that by using its domain as the trigger to generate advertisements that at times would appear "on," "over," or "on top of" the 1-800's website without its authorization, WhenU created a likelihood of confusion and violated the plaintiff's trademark by "free-riding" and "trading upon the goodwill and substantial consumer recognition associated with the [plaintiff's] marks." *Id*. at 405.

The Second Circuit held that WhenU did not "use in commerce," as the term is defined in § 1127 of the Lanham Act, 1-800's domain name either by including that domain name in its online directory or by causing the pop-up advertisements to appear when a user accessed 1-800's website. *Id*. at 408-09. By including the plaintiff's domain name in its directory, When-U was not reproducing its mark to denote the brand or affiliation of any products—indeed, no client of When-U's nor any of those clients' prospective customers ever *saw* the domain name in When-U's directory, nor could When-U's clients request that pop-up ads for their products be specifically linked to the plaintiff's website. The domain name as it appeared in When-U's directory served merely as a key or tool to ensure that visitors of the plaintiff's website would be simultaneously made aware of products in the same category. It did not matter what the text of the domain name was as long as it served the function of causing ads to appear to any viewer who accessed 1-800's website. *See id*. at 409 ("[When-U used] 1-800's website address precisely because it is a website address, rather than because it bears any resemblance to 1-800's trademark, because the only place WhenU reproduces the address is in [its] directory.").

The Second Circuit also rejected the theory that WhenU used 1-800's mark by placing pop-up ads on an Internet user's screen simultaneously with the 1-800 website. *Id*. at 409-10. The pop-up ads themselves appeared in a separate window, did not display the 1-800 trademark,

and had "absolutely no tangible effect on the appearance or functionality of the 1-800 website."

*Id*. at 410.  The court analogized the pop-up ads generated by WhenU to the "routine" practice of

vendors "to seek specific 'product placement' in retail stores precisely to capitalize on their

competitors' name recognition."  *Id*. at 411.  It elaborated:

> For example, a drug store typically places its own store-brand generic products next
> to the trademarked products they emulate in order to induce a customer who has
> specifically sought out the trademarked product to consider the store's less-
> expensive alternative. WhenU employs this same marketing strategy by informing
> C-users who have sought out a specific trademarked product about available
> coupons, discounts, or alternative products that may be of interest to them.

*Id*.

The Second Circuit drew a distinction between the pop-up windows and permissible

"product placement" and the usurpation of trademarks to market products not associated with

them, when it distinguished the cases proffered by 1-800:

> The cases relied on by 1-800 do not alter our analysis . . . Significantly, WhenU's
> activities do not alter or affect 1-800's website in any way.  Nor do they divert or
> misdirect [internet users] away from 1-800's website, or alter in anyway the results
> a[n] [internet user] will obtain when searching with the 1-800 trademark or website
> address."

*Id*. at 411 (citing *Playboy Enters.*, 354 F.3d at 1024).

In direct contrast to *1-800 Contacts*, the allegation here is that IP Video Corp. utilized the

domain www.flysense.com precisely *because* it "bears [a] resemblance to [Flysense]'s

trademark."  *Id*. at 409.  Plaintiff's theory of the case, which is plausible from the facts alleged, is

that IP Video Corp. hoped to capture customers who believed—with good reason—that by

typing www.flysense.com into the address bar of a web browser that they would be accessing a

website purveying Flysense products.[4]  Here it is plain from Plaintiff's allegations that

---

[4] Defendant seizes on the language in *1-800 Contacts* that WhenU "d[id] not reproduce or
display 1-800's trademarks at all," but rather "reproduces 1-800's website address,
«www.1800contacts. com.», which is similar, but not identical, to 1–800's CONTACTS

Defendant's alleged actions "divert[ed] or misdirect[ed] [internet users] away from [plaintiff's] website" and specifically "altered" the results an Internet user would obtain when searching for the domain name that contained the Flysense Mark.  *Id*.  *See Bihari*, 119 F. Supp. at 319-21 (discussing cases upholding trademark infringement claims where a defendant "was using the plaintiff's mark to trick Internet users into visiting defendant's website, believing either that they were visiting plaintiff's website or that the defendant's website was sponsored by the plaintiff"); *see also Brookfield Commc'ns*, 174 F.3d at 1064; *Playboy Enters.*, 985 F. Supp. at 1221. Although IP Video Corp. emphasizes that once the customer entered its home page it would see products branded only with the HALO mark, nothing in its argument regarding "use in commerce" turns on that distinction.  As Defendants admitted at oral argument, under their theory, IP Video Corp.'s use of the Flysense Mark as part of its domain name would not be a "use in commerce," even if the products on the home page were not branded at all.  In *1-800 Contacts*, the ruling was that the use of defendant's mark as an address (and not as an identifier)

---

trademark."  *1-800 Contacts*, 414 F.3d at 408.  The court observed that "the differences between the marks are quite significant because they transform 1-800's trademark—which is entitled to protection under the Lanham act—into a word combination that functions more or less like a public key to 1-800's website."  *Id*. at 408-409.  Importantly for purposes of the instant case, the court continued: "Moreover, it is plain that WhenU is using 1-800's website address precisely because it is a website address, rather than because it bears any resemblance to 1-800's trademark, because the only place WhenU reproduces the address is in [its] directory."  *Id*.  This aspect of the 1-800 holding is critical, because liability under the Lanham Act is not limited to incidents of a defendant reproducing a carbon-copy of a plaintiff's registered trademark.  *See Virgin Enters.*, 335 F.3d at 149 ("When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused."); *Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 191 (S.D.N.Y. 2008) ("The focus [under the Lanham Act] is on confusing similarity, not on whether the marks are identical.") (citing *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962-63 (2d Cir. 1996)).  The Second Circuit was merely noting, as discussed above, that the *capacity* in which When-U used the plaintiff's domain name by including it in its directory was as a key to trigger pop-up ads and ensure that visitors to the plaintiff's website would also be made aware of competing products.  It did not function to identify the brand or affiliation of any products.

promoted competition and the goals of the Lanham Act.  Here, there is no other "address" for the

virtual store on the Internet and no other mechanism by which to achieve in the virtual world the

product placement that is procompetitive in the physical world other than the use of a domain

name (or a metatag).  A ruling that IP Video Corp. could use the Flysense Mark as the domain

name for its virtual store would defeat the goals of the Lanham Act.

Finally, Congress's passage in 1999 of the Anticybersquatting Consumer Protection Act

("ACPA"), 15 U.S.C. § 1125(d)(1)(A), only confirms the Court's conclusion.  A central purpose

of the ACPA was to prevent bad-faith actors from registering but not using domain names in

order "to extract payment from the rightful owners of the marks, who find their trademarks

'locked up' and are forced to pay for the right to engage in electronic commerce under their own

brand name."  S. Rep. No. 106-140, at 5 (1999); *see id*. at 4 ("The purpose of [the ACPA] is to . .

. provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive

registration of distinctive marks as Internet domain names with the intent to profit from the

goodwill associated with such marks.").  The law is addressed to the phenomenon of

"[c]ybersquatting [which] involves the registration as domain names of well-known trademarks

by non-trademark holders who then try to sell the names back to the trademark owners," *Sporty's

Farm LLC*, 202 F.3d at 493, and was intended to remedy the "perceived shortcomings" of

existing law "by prohibiting the bad-faith and abusive registration of distinctive marks as

Internet domain names with the intent to profit from the goodwill associated with such marks,"

*id.* at 495-96.  It thus addresses parties who, "without regard to the goods or services of the

parties," register, traffic in, or use a domain name that is distinctive or famous with the "bad faith

intent to profit from that mark."  15 U.S.C. § 1125(d)(1)(A).  The premise of the ACPA then is

that a domain name has value as a trademark in connection with its use in commerce with regard

to the goods and services it identifies: because of how a customer finds a store on the Internet, "companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix .com." *Sporty's Farm LLC*, 202 F.3d at 493.

      To hold that the ACPA reflects Congress's intent to preclude trademark claims based on the use of another's trade name in a web address to market similar or identical products would then be to conclude that Congress, while closing one gap in the law opened another.  Sections 1114(a) and 1125 of the Lanham Act address conduct by a defendant with regard to marketing goods and services.  They thus address conduct that is not addressed or only imperfectly addressed by the ACPA.  The ACPA, as noted, requires a plaintiff to prove that the defendant had the "bad faith intent to profit" in order to establish liability.  It goes on to list as relevant to the determination of a "bad faith intent to profit" factors such as "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct," and "the person's registration or acquisition of multiple domain names."  15 U.S.C. §§ 1125(d)(1)(B)(i)(VI), (VIII).[5]  Evidence that the defendant *used* the site with another's domain name—rather than merely making it unavailable to another party—"*undermin[es]*" and does not support a finding of liability.  *Sporty's Farm LLC*, 202 F.3d at 499 (emphasis added).  So too evidence that the defendant misappropriated only one domain name—such evidence might tend to undermine a conclusion of "bad faith intent to profit" and of liability.  *Id*.  For

---

[5] The ACPA also lists as a factor "the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct."  15 U.S.C. § 1125(d)(1)(B)(i)(VII).

purposes of establishing a trademark violation under the Lanham Act, however, bad faith is only one factor and is not dispositive. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005) ("[E]vidence that the imitative mark was adopted in bad faith" is one among eight factors for identifying a "likelihood of confusion" for purposes of a trademark claim; the analysis is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused").

A defendant is not excused from misappropriating another's mark and using it in commerce by a claim she did not act in bad faith. Indeed, claims for trademark infringement and unfair competition under the Lanham Act exist to protect the consumer as well as the competitor, and they do not require a showing of willfulness at all. *See* 15 U.S.C. § 1117(c) (providing for a higher range of statutory damages for willful use of a counterfeit mark); *Value Wholesale, Inc. v. KB Ins. Co.*, 450 F. Supp. 3d 292, 306 (E.D.N.Y. 2020) ("[C]ourts have found that allegations of Lanham Act violations preclude application of an intentional acts exclusion because one can be found strictly liable under the Lanham Act, with no finding made as to one's intent."); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 164 (E.D.N.Y. 2016) (discussing statutory damages for non-willful infringement of registered marks) (citing 15 U.S.C. § 1117(c)); *see also CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d. Cir. 2013) ("Despite the boilerplate allegation of willful misconduct, Five Four's Lanham Act section 43(a) claim did not require it to prove that CGS intended to infringe on its trademark, as such a claim does 'not require proof of intent to deceive.'"). And, of course, a defendant's conduct is not excused if she only used one of the plaintiff's trademarks in commerce. It may be that in this case Plaintiff will be able to prove the elements of the ACPA and that some of the conduct at issue in this action will therefore be addressed by the ACPA. But there is no evidence

19

that in passing the ACPA Congress intended to hive off claims based on the infringement of a mark through a domain name from all of the other means by which a defendant can infringe a mark and to require that for such claims, and such claims alone, the plaintiff must meet the more stringent requirements of the ACPA.

For the foregoing reasons, Plaintiff has adequately pled that IP Video Corp. "use[d] in commerce" the Flysense Mark through its activities with respect to the www.flysense.com domain.

### 2.        Likelihood of confusion

Defendants also argue that Plaintiff has not plausibly alleged a likelihood of confusion. According to Defendants, no consumer would likely confuse Defendants' product with Plaintiff's product because once the consumer enters Defendants' website they will see the name HALO prominently posted (and not Flysense) and, even after entering the website, they will not be able to purchase the product directly.  Rather, Defendants argue that both the HALO Device and Flysense Device are sold through public bids to sophisticated purchasers, and that such customers would not be susceptible to making—or even able to make—an impulsive online purchase on the basis of any brand confusion.  Defendants rely on the notion that "initial interest confusion," upon which they claim the Amended Complaint is based, is a disfavored doctrine in the Second Circuit particularly in the Internet context because a consumer who mistakenly enters a virtual store based on a false designation of origin can quickly exit that store with "one click" on a computer keyboard.  *See Savin Corp.*, 391 F.3d at 462 n.13 ("Because consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of intentional deception."); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d. 450, 466 (E.D.N.Y. 2011) ("[T]he harm caused by initial

interest confusion in the internet context is minimal as 'with one click of the mouse and a few seconds delay, a viewer can return to the search engine's results and resume searching for the original website.'") (quoting *Bihari*, 119 F. Supp. 2d at 320 n.15).

The Court concludes that Defendants' argument presents issues of fact that cannot be disposed of on a motion to dismiss.  Plaintiff has pleaded sufficient facts to "raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives,* 563 U.S. at 46 (2011) (same).

 As an initial matter, Defendants do not substantially dispute that Plaintiff has satisfied the eight-factor balancing test, first articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), for evaluating likelihood of confusion.  *See also Bihari*, 119 F. Supp. 2d at 319 ("In instances in which a website uses another entity's trademark in the domain name, application of the *Polaroid* factors is simple because the defendant has adopted a mark—namely, the website domain name—that incorporates or is strikingly similar to another mark.") (collecting cases).  The eight so-called Polaroid factors are: (1) the strength of the trademark; (2) the similarity of the marks; (3) the proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication (or lack thereof) of consumers in the relevant market.  *See Star Indus., Inc.*, 412 F.3d at 384.  Application of the Polaroid test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Id.*

In brief: the first and second factors clearly support Plaintiff; the term "flysense" is inherently distinctive, and, as discussed above, IP Video Corp. used the term in the domain name www.flysense.com precisely for those reasons. *See Eric Louis Assocs.*, 79 F. Supp. at 341 (sustaining a claim where "[i]t was precisely the recognizability of the Society's mark that led Defendant to adopt the 'nysscpa.com' domain name and the 'NYSSCPA' meta-tag"); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *8 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (plaintiff's mark "Planned Parenthood" and domain name used by defendant "plannedparenthood.com" were "nearly identical," increasing likelihood of confusion).  The third and fourth factors favor Plaintiff because there is no dispute that the products are directly competitive within the same market (i.e. there is no gap to bridge), and the allegedly offending site was "compet[ing] for the same audience [as Plaintiff]—namely, Internet users who are searching for a web site that uses [P]laintiff's mark as its address." *Eric Louis Assocs.*, 79 F. Supp. 2d at 341 (quoting *Planned Parenthood*, 1997 WL 133313, at *8).  Turning to the fifth factor, evidence of actual confusion, Soter's CEO has declared that "purchasers of vape detecting sensor products often do not understand the differences between FlySense and HALO devices . . . we have had purchasers that bought HALO devices thinking they were buying FlySense devices, later approach us to replace such devices."  Dkt. No. 12 ¶ 55.  Allegedly confused parties include a re-seller of Plaintiff's goods and at least one prospective customer.  *Id*.  ¶¶ 66-67, 85.  While IP Video Corp. argues that no customer actually has been confused, that argument will have to await discovery.  As to the sixth factor, it is plausibly alleged that Defendant IP Video Corp. acted in bad faith by using the domain name.  "The good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and

the senior user's product." *Savin Corp.*, 391 F.3d at 460 (internal quotation marks and citation omitted). As discussed further *infra*, the Flysense Mark is particularly distinctive; Defendants allegedly knew of Plaintiff's use of the mark before launching a website with the identical mark and there would be no reason for Defendants to use it in a domain name *except* to capitalize on Plaintiff's reputation by attracting customers that are seeking to find information about or options to purchase Plaintiff's products.[6] The good faith factor therefore supports a finding of confusion. As to the seventh factor, Plaintiff does not allege that Defendants' product is of an inferior quality, so that factor is neutral or favors Defendants. Finally, although the prospective customers of both parties are institutions, courts have held that initial interest confusion "afflicts sophisticated visitors no less than it does unsophisticated visitors." *Eric Louis Assocs.*, 79 F. Supp. 2d at 341 (citing *Planned Parenthood*, 1997 WL 133313, at *9).

Rather than challenging this analysis, Defendants argue that because the Flysense Mark did not appear in the content of the website at issue, or on any of Defendants' marketing materials, it is not plausible that any consumers would have mistakenly believed, when they were purchasing a HALO product, that they were actually purchasing a Flysense product. That rejoinder does not address all of the harms that the initial interest confusion doctrine helps to prevent, which include:

---

[6] Because Plaintiff's have plausibly alleged that IP Video Corp. made use of the domain name in bad faith, and because the other elements of trademark infringement and unfair competition are met, as discussed in this section, its common law claims brought under New York law are also sustained. *See Lopez*, 2020 WL 2539116, at *15; *Eyal R.D. Corp. v. Jewelex New York Ltd.*, 784 F. Supp. 2d 441, 447 (S.D.N.Y. 2011) ("In New York, 'the essence of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'") (quoting *Jeffrey Milstein v. Greger, Lawlor, Roth Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995)).

> [T]he original diversion of the prospective customers' interest; the potential consequent effect of that diversion on the customer's ultimate decision whether or not to purchase caused by an erroneous impression that two sources of a product may be associated; and the initial credibility which may be accorded by the interested buyer to the junior user's products—customer consideration that otherwise may be unwarranted and that may be built on the strength of the senior user's mark, reputation and goodwill.

*BigStar Entm't, Inc.*, 105 F. Supp. 2d at 207 (citing *Brookfield Comm'cns., Inc.*, 174 F.3d at 1063-64); *see also Bihari*, 119 F. Supp. 2d at 319 (noting that a harm in the Internet context is that "the potential customer believes that the competing website is associated with the website the customer was originally searching for and will not resume searching for the original website"). Thus, as Plaintiff convincingly responded at oral argument, its rights would have been violated, even if its brand name was not attached to the HALO products on the home page, if the use of its mark as a domain name was "likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods." *Gucci*, 868 F. Supp. 2d at 237 (internal quotation marks omitted); *see Savin Corp.*, 391 F.3d at 456 ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the *source* of the goods in question.") (emphasis added) (internal quotation marks and alterations omitted). Nor does the fact that a prospective customer could not actually complete a purchase through IP Video Corp.'s website eliminate any risk of confusion. *See Coty Inc.*, 277 F. Supp. at 441-42 ("[I]nitial [] interest confusion occurs where a defendant's use of a plaintiff's mark 'creates initial customer interest, even if no final sale is completed as a result.'") (quoting *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 551 (S.D.N.Y. 1996)) (collecting cases); *see Bihari*, 119 F. Supp. 2d at 319.

The allegations of the Amended Complaint thus state a claim. Plaintiff alleges plausibly that its trademark is distinctive, and that Defendants utilized it as an identifier—tantamount to a

virtual sign—with the requisite intent to deceive.  *See Savin Corp.*, 391 F.3d at 462 n.13;

*compare BigStar Entm't, Inc.*, 105 F. Supp. 2d at 209 (declining to apply the initial interest

confusion doctrine where "defendants' domain name ('nextbigstar.com') [was] not 'virtually

identical' to plaintiff's trademarks or website ('bigstar.com') . . . in terms of sight, sound or

meaning, nor one the ordinary, reasonably informed relevant purchaser could . . . regard as

exactly the same").  Plaintiff has alleged facts that, if proven, would show that Defendants used

the Flysense name to intentionally deceive customers into believing that their products were

sponsored by the manufacturer of the Flysense Device or shared the same origin.  *See SNA*, 51 F.

Supp. at 552 ("Internet users expect that a site with a domain name that is a trademark is

somehow related to the owner of the trademark. It is highly likely that a person visiting this

website would think there is a relationship between the company that makes the [plaintiff's

product] and a company using [plaintiff's product's name] for its domain name.").  It also alleges

that the parties offer directly competitive products.  *See BigStar Entm't, Inc.*, 105 F. Supp. 2d at

209 (noting that courts applying the initial interest doctrine rely, in part, on the "strong

competitive proximity between the products offered by the rival claimants" which is not present

where "the products in question are used for substantially different purposes and therefore the

merchants are not in close competitive proximity").  It thus plausibly alleges that Defendants

have "sought knowingly to benefit from public recognition of [Soter's] name and credibility by

seeking to attract potential customers the infringer ordinarily would not have had," *id.* at 210,

which is precisely the type of harm that the initial interest doctrine protects against.  *See id.* at

207; *Bihari*, 119 F. Supp. 2d at 319.[7]  Even if a customer who uses the www.flysense.com

---

[7] The only case cited by Defendants in which a court declined to exercise the initial interest
confusion doctrine in the Internet context due to an absence of likelihood of confusion involved
materially different facts.  See *Ascentive*, 842 F. Supp. at 465 (rejecting a claim where

domain name enters a website that mentions only products with a HALO tradename, and even if

a consumer who saw only HALO products on the offending website could simply hit the back

button and exit the website, that would not protect against the harm caused if the consumer is left

with the impression that the HALO Device shares the same sponsor as the products branded with

the Flysense Mark.  Because it is plausible, at this stage, that such confusion may occur, Plaintiff

has stated a claim for relief.

        **B.**      **Claims regarding "compatible with" representation**

Defendants also move to dismiss Plaintiff's claims for unfair competition under federal

and state law in connection with the alleged statement that the HALO Device is "compatible"

with the Flysense platform.  *See* Am. Compl. ¶¶ 51-53.  These claims must be dismissed both

because the Amended Complaint does not properly allege the representation it identifies was in

in fact made by any Defendant, and because the alleged representation does not satisfy the

elements for unfair competition.

Conclusory allegations are not sufficient to state a claim.  *Iqbal*, 556 U.S. at 678.  Rather,

a complaint must contain "sufficient *factual matter*, accepted as true to 'state a claim for relief

that is plausible on its face.'"  *Id*. (citing *Twombly*, 550 U.S. at 570).  The only factual allegation

that can be adduced from the Amended Complaint regarding an alleged representation that the

HALO Device is "compatible with" the Flysense Device is based upon a bid submitted by ACP

("ACP Bid")—not a party to this lawsuit—in response to a request for quote ("RFQ") issued by

the Mission District.[8]  The Amended Complaint contains no allegations that ACP submitted its

bid in a capacity as agent to any of the Defendants.  *See Skanga Energy & Marine Ltd. v.*

---

defendants website was "not in competition with those of plaintiffs" because the parties were in
"completely different fields").

[8] At oral argument Plaintiff did not dispute that it alleges no other instances in which the Halo
Device was represented as "compatible" with the Flysense platform.

*Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012), *aff'd sub nom. Skanga Energy &*

*Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88 (2d Cir. 2013) ("To adequately

allege an actual agency relationship, a plaintiff [must] . . . allege facts sufficient to support a

reasonable inference of actual authority."); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461 (2d Cir.

1995) ("Authority is the power of the agent to affect the legal relations of the principal by acts

done in accordance with the principal's manifestations of consent to him.") (citing Restatement

(Second) of Agency § 7 (1958)).  A claim for unfair competition plainly cannot be sustained on

the basis of a representation not alleged to have been made by any Defendant.

Second, Plaintiff's argument that the representation created a likelihood of confusion is

undermined by the context of the representation itself.  The representation appears in the ACP

Bid in the form of language evidently drafted by the Mission District as part of its RFQ.  It reads:

> 3. SPECIFICATIONS
>
> The specifications below and/or mentioned in any part of the solicitation will be understood as indicating type, function, minimum standard of design, efficiency and quality desired, and will not be construed in such a manner as to exclude manufacturer's products of comparable quality, design and efficiency.  Whenever any part of the solicitation, contract documents, an article, or material, is defined describing a proprietary product, or by using the name of a manufacturer or vendor, the term "or District approved equal", if not inserted, will be implied.
>
> If brand/model other than specified is offered, complete descriptive information of said brand/model must be included with the response.
>
> - 40 – vape detectors
>   - Detection area minimum, 10'x10' and 12'x12' room
>   - Vandal-proof
>   - Must be compatible with Fly Sense Platform
>   - Must be able to power up through POE (power over Ethernet)
>   - 1 Year Warranty (minimum)

Dkt. No. 59-6.

Read in its full context, it is clear that Mission District itself intended any representation that a

bid is for a product that is "compatible with Fly Sense Platform" to carry the "implied"

qualification "or District approved equal," and moreover that such representation should be only understood "as indicating type, function, minimum standard of design, efficiency, and quality desired" and should specifically "*not* be construed in such a manner as to exclude manufacturer's products of comparable quality, design and efficiency." *Id.* This definitively forecloses any possibility that by merely submitting a bid in response to the Mission District's RFQ containing the above language, ACP—let alone any Defendant in this case—was "likely to cause confusion or to deceive [the Mission District] as to the origin of the goods" it was purveying. *BubbleGenius LLC v. Smith*, 239 F. Supp. 3d 586, 601-02 (E.D.N.Y. 2017). Reading the statement as a whole, there is nothing wrong or inaccurate about it. ACP's bid repeatedly identified that the product it was offering was the HALO Device, and it nowhere mentioned the Flysense Device or Soter, except insofar as it did not delete the language on the RFQ form itself that is quoted above. Accepting Plaintiff's argument would require holding that any party unaffiliated with Soter and the Flysense Device that merely filled out the Mission District's RFQ form would thereby subject itself to claims for trademark infringement and/or unfair competition.[9] That extreme holding is not supported by the conduct of ACP, let alone any Defendant, or by the plain language in the RFQ form on which Plaintiff relies.

## C.   Product disparagement

Plaintiff alleges three statements made to a potential Soter customer about the Flysense Device as the basis for its claim for product disparagement: (1) that the Flysense Device did not work; (2) that the Flysense Device was associated with too many false positives, and (3) that the Flysense Device was embroiled in litigation. Am. Compl. ¶¶ 48, 116. These statements were allegedly made by an unidentified "representative of Defendants" to a "school on the West

---

[9] The Amended Complaint does not specify the legal theory under which it brings claims regarding the Mission District bid.

Coast" that was a potential customer of Plaintiff.  *Id*. ¶ 116.  Plaintiff alleges that these statements were not true and caused it to lose at least one sale in 2019 and to suffer damages of at least $1,990.  *Id*. ¶¶ 49-50, 121.  Plaintiff also alleges "Defendant IP Video Corporation has made other false statements directly leading Soter to lose sales for which both Plaintiff and Defendant IP Video Corp[.] were competing," *id*. ¶ 51, however this conclusory assertion is not supported by any factual allegations and cannot form the basis for a claim.  *See Iqbal*, 556 U.S. at 678.

Under New York law, "'[t]rade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property.'"  *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (quoting *Angio–Med. Corp. v. Eli Lilly & Co.*, 720 F.Supp. 269, 274 (S.D.N.Y. 1989)).  "To state a claim for trade libel, a plaintiff must adequately plead '(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages.'"  *Id*. (quoting *Angio–Med. Corp.*, 720 F. Supp. at 274)); *accord Computech Int'l, Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002).

Plaintiff here has not adequately pled special damages.  "Special damages are pecuniary losses (including loss of sales) resulting from a defendant's allegedly wrongful conduct." *Verizon Directories Corp.*, 309 F. Supp. 2d 401, 406 (E.D.N.Y. 2004) (citing *Drug Research Corp. v. Curtis Publishing Co.*, 199 N.Y.S.2d 33, 37 (1960); *Charles Atlas, Ltd. v. Time–Life Books, Inc.*, 570 F. Supp. 150, 155 (S.D.N.Y. 1983)).  An adequate pleading of special damages must clear several hurdles.  First, special damages are "limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify

actual losses." *Enigma Software Grp.*, 194 F. Supp. 3d at 292 (quoting *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992)). In addition, "special damages must be the 'natural and immediate consequence of the disparaging statements' to be recoverable.'" *Kirby*, 784 F. Supp. at 1116 (quoting *Angio–Medical*, 720 F. Supp. at 274); *see Cambridge Assoc. v. Inland Vale Farm Co.*, 497 N.Y.S.2d 751, 753 (2d Dept. 1986) (special damages must be "related causally to the alleged tortious acts"). Finally, "if the special damage was a loss of customers . . . the persons who ceased to be customers, or who refused to purchase, must be named . . . if they are not named, no cause of action is stated." *Enigma Software Grp.*, 194 F. Supp. 3d at 292 (quoting *Drug Research Corp.*, 199 N.Y.S.2d at 37). Whether a plaintiff has suffered special damages "goes to the cause of an action itself and not merely to the recovery. . . . Courts considering product disparagement claims have therefore applied this requirement strictly, granting motions to dismiss . . . for failure to allege special damages with the requisite specificity." *Id.* (quoting *Computech Int'l*, 2002 WL 31398933, at *6).

Plaintiff has met none of the requirements for pleading special damages. It has neither pled its damages with particularity, nor plausibly alleged a causal connection between the alleged statements and a lost sale, nor named the customer it allegedly lost. The Amended Complaint alleges that "[a]s a natural and immediate consequence of [the] disparaging statements [alleged], Soter suffered monetary losses in the amount of at least $1990." Am. Compl. ¶ 120. Pleading damages of "at least $1990," with no further explanation, falls short of the requirement to plead damages with particularity. *See, e.g., Enigma Software Grp.*, 194 F. Supp. at 292 (dismissing allegation that plaintiff "has and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000"); *Kirby*, 784 F. Supp. at 1116, 1118 ("vague allegation[ ]" that plaintiff sustained $250,000 in damages as

a result of disparaging remarks about a painting it sought to sell, without "specify[ing] the losses underlying that figure" or identifying any person who did not bid on the painting because of the alleged disparagement, was "clearly inadequate" to plead special damages); *Drug Research Corp.*, 199 N.Y.S.2d at 33 (plaintiff failed to plead special damages where it alleged damages of $5 million because "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").  The Amended Complaint also lacks all but the most conclusory allegation that the alleged statements caused it to lose a sale.  It pleads no facts that a sale was imminent or even foreseeable with the audience to those statements.  Nor does it name the customer other than as "a school on the west coast," Am. Compl. ¶¶ 48, 116.  *See Enigma Software Grp.*, 194 F. Supp. 3d at 292; *Drug Research Corp.*, 199 N.Y.S.2d 33 (potential customer must be named to sustain a claim for special damages).

Because the Amended Complaint does not adequately allege special damages, the Court need not reach the other elements and the claim for product disparagement must be dismissed.

### D.    Claims against A+ Technology and Advance

Finally, Defendants argue that the claims against Defendants A+ Technology and Advance should be dismissed because none of the allegations specify conduct undertaken by them.  Defendants point out that the allegedly infringing domain name diverts customers specifically to Defendant IP Video Corp.'s website, not to the website of either A+ Technology or Advance.  *See* Am. Compl. ¶¶ 9, 35.

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Although [Rule 8(a)] does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests."  *Manchanda v. Navient Student Loans*, 2020 WL

5802238, at *2 (S.D.N.Y. Sept. 29, 2020) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)).  "Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."  *Id.* (quoting *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012)).  A complaint may not simply "lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct."  *Atuahene*, 10 F. App'x at 34.

Under these standards, Plaintiff has not alleged facts sufficient to sustain a claim against A+ Technology or Advance.  The only allegations against those Defendants are that they "conspire[d]" together with IP Video Corp. to manufacture and market the HALO Device, Am. Compl. ¶ 35; that A+ Technologies and Advance each advertise the HALO Device on their websites, *id.* ¶¶ 10-11; that "[a]ll three Defendants share office locations, resources and executives," *id.* ¶ 12; and that all three Defendants had actual and constructive knowledge of the Flysense Mark, *id.* ¶¶ 39, 80, 107.

Although in its opposition brief Plaintiff points to its allegations that the three Defendants shared offices and executives, it does not argue—and nor could it based on the allegations in the instant complaint—that it has plead a claim for alter ego liability.  Such liability only exists where "the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own."  *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 296 (E.D.N.Y. 2014) (quoting *OOO "Garant–S" v. Empire United Lines Co., Inc.*, 557 F. App'x 40, 45 (2d Cir. 2014)).  Under New York law, to determine whether the first requirement, domination, has been met, the following equitable factors are considered:

(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm['s] length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id.* (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 464-65 (S.D.N.Y. 2005)); *see Wm. Passalacqua Builders, Inc. v. Resnick*, 933 F.2d 131, 139 (2d Cir. 1991). Domination sufficient to establish alter ego liability is not pled here. Although there are allegations that the entities share office space and corporate executives, absent are any allegations that corporate formalities were not observed, of inadequate capitalization, that the companies were not treated as independent profit centers, that there was any intermingling of funds among the Defendants, or, generally, of any domination by one Defendant of any others.

The allegations that are specific to A+ Technology and Advance—that they were involved in marketing the HALO Device and aware of Plaintiff's rights in the Flysense Mark— do not allege any wrongdoing (or any involvement) in connection with registration of the allegedly infringing domain name.

It is true that "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015) (quotation marks omitted). Moreover, where a joint scheme among multiple defendants is alleged, a "plaintiff need not explain the details of each defendant's role in the planning,

funding, and execution [of] defendant's alleged joint [] scheme." *Hudak v. Berkley Group, Inc.*, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014).  In this case, however, there are no factual allegations that plausibly state that A+ Technology and Advance were involved in a scheme at all.  The predicate for relief is a discrete act: utilizing the domain name www.flysense.com to direct prospective customers to Defendant IP Video Corp.'s website.  There are well-pled allegations linking that conduct to IP Video Corp.  The Amended Complaint contains no allegations of fact linking that conduct to A+ Technologies or Advance.  *Compare Vantone Grp. Liab. Co.*, 2015 WL 4040882, at *4 (declining to dismiss a claim on Rule 8 grounds where "[a]lthough it is far from precise, the [complaint] does make factual allegations that distinguish between the conduct of [the defendants], listing specific actions taken by each of them"); *Hudak*, 2014 WL 354676, at *4 ("The complaint clearly alleges that the two defendants acted jointly in violation of the TCPA by causing calls to be made to plaintiff's phone.").  The facts that all three Defendants may have shared resources and that they each marketed the HALO Device fall far short of supporting a claim that either A+ Technology or Advance had any involvement in the registration or use of the allegedly infringing domain name.  Accordingly, all claims against those Defendants are dismissed without prejudice.

### E. Leave to replead is granted in part

Plaintiff's claims brought in connection with its allegation that Defendants represented that the HALO Device was "compatible with" the Flysense platform are dismissed with prejudice.  A court "should freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But "it is within the sound discretion of the district court to grant or deny leave to amend," and "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (internal citations omitted).  Repleading

would be futile when the "problem with [the pleader's] causes of action is substantive." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Plaintiff avers in its opposition that it is now in possession of "additional facts" on the basis of which it could plead that ACP did in fact submit its bid to the Mission District in the capacity of agent to Defendant IP Video Corp.  *See* Dkt. No. 64 at 18.  Such pleading would be futile, however, as it is not plausible that the representation Plaintiff identifies is likely to cause confusion about the source of the goods in question.  *See supra*.  Accordingly, any claims brought in connection with that representation are dismissed with prejudice.  The other claims against Defendants A+ Technology and Advance are dismissed without prejudice,[10] as is the claim for product disparagement.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED IN PART.  The claims brought in connection with Defendants' alleged misrepresentation that the HALO Device is "compatible with" the Flysense platform are DISMISSED with prejudice.

Count Six for product disparagement is DISMISSED without prejudice.

The remaining claims against Defendants A+ Technology and Advance are DISMISSED without prejudice.  The Clerk of Court is respectfully directed to terminate those parties.

Plaintiff is granted leave to file a second amended complaint within 30 days of the date of this Opinion and Order.

---

[10] In its opposition, Plaintiff argues it has emerged in discovery that David Antar—who is alleged in the Amended Complaint to be President of IP Video Corp. and A+ Technology, and Chief Executive Officer of Advance, *see* Am. Compl. ¶ 12—purchased the allegedly infringing domain name, and that "by virtue of Mr. Antar's position with each of the Defendants, all of them are implicated" in Plaintiff's claims.  Dkt. No. 64 at 24-25.  That information is not in the Amended Complaint, and Plaintiff is granted leave to include it in an amended pleading.  The Court notes, however, that Plaintiff has pointed to no evidence from any source to suggest that Antar purchased the allegedly infringing domain name in any capacity other than as President of IP Video Corp.—to whose website the allegedly infringing domain name diverted users.

The Court will hold a status conference to discuss case management on March 11, 2021 at 10:30 a.m. by TELEPHONE CONFERENCE. At that date and time the parties are directed to dial the Court's teleconference line at 888-251-2909 (access code: 2123101).

SO ORDERED.

Dated: February 26, 2021
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge